UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA


DEBRA A. ELLIOTT,                                    CIV. NO. 12-1741 (MJD/JSM)

        Plaintiff,

                                             REPORT AND RECOMMENDATION

v.

CAROLYN COLVIN,[1]
Acting Commissioner of Social Security,

        Defendant.

        This matter is before the Court on cross-motions for summary judgment [Docket

Nos. 11 and 14].  This Court has jurisdiction over the matter pursuant to 42 U.S.C. §

405(g).  This matter has been referred to the undersigned Magistrate Judge for a Report

and Recommendation by the District Court pursuant to 28 U.S.C. §636(b)(1)(B) and

Local Rule 72.1(c).

        For the reasons discussed below, it is recommended that Plaintiff's Motion for

Summary Judgment [Docket No. 11] be **DENIED** and that Defendant's Motion for

Summary Judgment [Docket No. 14] be **GRANTED.**

I.      **PROCEDURAL BACKGROUND**

        Elliott protectively filed for disability insurance benefits and supplemental security

income ("SSI") on July 30, 2008, alleging a disability onset date of June 23, 2008.  (Tr.

_____

[1]      Elliott sued Michael J. Astrue, who was then the Commissioner of Social
Security.  Complaint [Docket No. 1].  Carolyn W. Colvin became the Acting
Commissioner of Social Security on February 14, 2013.  Pursuant to Fed. R. Civ. P.
25(d), Carolyn W. Colvin has been substituted for Michael J. Astrue.

169-170, 200). Elliott claimed to be suffering from Oddi dysfunction,[2] kidney, gallbladder, liver and pancreas problems. (Tr. 205). Elliott was last insured for disability benefits on December 31, 2012. (Tr. 23). Elliott's claims were initially denied on December 15, 2009 (Tr. 81) and denied on reconsideration on May 28, 2009 (Tr. 91-98). Elliott timely requested a hearing on June 8, 2009. (Tr. 99-100).

A hearing was held on November 3, 2010, before ALJ Leonard Nelson. (Tr. 38-62). Elliott was represented by counsel at the hearing. (Tr. 40). Elliott, impartial medical expert Dr. Andrew Steiner (the "ME"), and impartial vocational expert Jesse Ogren (the "VE") testified. (Tr. 4-13, 54-61).

On December 2, 2010, the ALJ issued his decision denying Elliott benefits. (Tr. 18-31). On January 20, 2011, Elliott sought further review of the ALJ's decision by the Appeals Council. (Tr. 13-14). The Appeals Council denied Elliott's request for review, making the ALJ's decision final. (Tr. 1-4). 20 C.F.R. §§ 404.981, 416.1481 42 U.S.C. § 405(g); Browning v. Sullivan, 958 F.2d 817, 822 (8th Cir. 1992); 20 C.F.R. §§404.981, 416.1481. In connection with her Request for Review, Elliott submitted medical evidence not considered by the ALJ and dating from 2011. (Tr. 2). The Appeals Council rejected this evidence as beyond the scope of the ALJ's decision whether Elliott was disabled on or before December 2, 2010. (Id.).

Elliott sought review of the ALJ's decision by filing a Complaint pursuant to 42 U.S.C. §405 [Docket No. 1]. The parties have cross-moved for summary judgment. [Docket Nos. 11, 14].

---

[2]     "Sphincter of Oddi dysfunction (SOD) is a poorly-understood disorder, typically presenting as postcholecystectomy, 'biliary-type' right-sided abdominal and/or chest wall pain." http://www.ncbi.nlm.nih.gov/pubmed/20424985.

## II.    PROCESS FOR REVIEW

Congress has prescribed the standards by which Social Security disability benefits may be awarded.  "The Social Security program provides benefits to people who are aged, blind, or who suffer from a physical or mental disability." Locher v. Sullivan, 968 F.2d 725, 727 (8th Cir. 1992); 42 U.S.C. § 1382(a).  The Social Security Administration shall find a person disabled if the claimant "is unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment." 42 U.S.C. § 1382c(a)(3)(A).  The claimant's impairments must be "of such severity that (the claimant) is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy."   42 U.S.C. § 1382c(a)(3)(B).   The impairment must last for a continuous period of at least twelve months or be expected to result in death.  42 U.S.C. § 1382c(a)(3)(A); see also 20 C.F.R. §§ 404.1509, 416.909.

### A.    Administrative Law Judge Hearing's Five-Step Analysis

If a claimant's initial application for benefits is denied, he or she may request reconsideration of the decision.  20 C.F.R. §§ 404.907-09, 416.1407-09.  A claimant who is dissatisfied with the reconsidered decision may obtain administrative review by an ALJ.  42 U.S.C. §§ 405(b)(1), 1383(c)(1); 20 C.F.R. §§ 404.929, 416.1429.  To determine the existence and extent of a claimant's disability, the ALJ must follow a five-step sequential analysis, requiring the ALJ to make a series of factual findings regarding the claimant's work history, impairment, residual functional capacity, past work, age,

education and work experience.  See 20 C.F.R. §§ 404.1520, 416.920; see also Locher,

968 F.2d at 727.  The Eighth Circuit described this five-step process as follows:

> The Commissioner of Social Security must evaluate: (1) whether the claimant is presently engaged in a substantial gainful activity; (2) whether the claimant has a severe impairment that significantly limits the claimant's physical or mental ability to perform basic work activities; (3) whether the claimant has an impairment that meets or equals a presumptively disabling impairment listed in the regulations; (4) whether the claimant has the residual functional capacity to perform his or her past relevant work; and (5) if the claimant cannot perform the past work, the burden shifts to the Commissioner to prove that there are other jobs in the national economy that the claimant can perform.

Dixon v. Barnhart, 353 F.3d 602, 605 (8th Cir. 2003).

### B.   Appeals Council Review

If the claimant is dissatisfied with the ALJ's decision, he or she may request

review by the Appeals Council, though review is not automatic.  20 C.F.R. §§ 404.967-

404.982, 416.1467-1482.  The decision of the Appeals Council (or of the ALJ, if the

request for review is denied) is final and binding upon the claimant unless the matter is

appealed to Federal District Court within sixty days after notice of the Appeals Council's

action.  42 U.S.C. §§ 405(g), 1383(c)(3); 20 C.F.R. §§ 404.981, 416.1481.

### C.   Judicial Review

Judicial review of the administrative decision generally proceeds by considering

the decision of the ALJ at each of the five steps.  The Court is required to review the

administrative record as a whole and to consider:

1.   The credibility findings made by the ALJ.

2.   The plaintiff's vocational factors.

3.   The medical evidence from treating and consulting physicians.

4.      The plaintiff's subjective complaints relating to exertional and non-exertional activities and impairments.

5.      Any corroboration by third parties of plaintiff's impairments.

6.      The testimony of vocational experts, when required, which is based upon a proper hypothetical question which sets forth plaintiff's impairment.

Cruse v. Bowen, 867 F.2d 1183, 1185 (8th Cir. 1989) (citing Brand v. Secretary of HEW, 623 F.2d 523, 527 (8th Cir. 1980)).

This Court's review is limited to determining whether the ALJ's decision is supported by substantial evidence in the record as a whole.  42 U.S.C. § 405(g); Bradley v. Astrue, 528 F.3d 1113, 1115 (8th Cir. 2008); Johnson v. Apfel, 210 F.3d 870, 874 (8th Cir. 2000); Clark v. Chater, 75 F.3d 414, 416 (8th Cir. 1996).  "We may reverse and remand findings of the Commissioner only when such findings are not supported by substantial evidence on the record as a whole."  Buckner v. Apfel, 213 F.3d 1006, 1012 (8th Cir. 2000) (citation omitted).

Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)); see also Culbertson v. Shalala, 30 F.3d 934, 939 (8th Cir. 1994).  "Substantial evidence is less than a preponderance, but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion."  Buckner, 213 F.3d at 1012 (quoting Prosch v. Apfel, 201 F.3d 1010, 1012 (8th Cir. 2000)); see also Slusser v. Astrue, 557 F.3d 923, 925 (8th Cir. 2009) (citing Gonzales v. Barnhart, 465 F.3d 890, 894 (8th Cir. 2006)) (same); Cox v. Apfel, 160 F.3d 1203, 1206-07 (8th Cir. 1998) (same).

In reviewing the record for substantial evidence, the Court may not substitute its own judgment or findings of fact for that of the ALJ. Hilkemeyer v. Barnhart, 380 F.3d 441, 445 (8th Cir. 2004); Woolf v. Shalala, 3 F.3d 1210, 1213 (8th Cir. 1993). The possibility that the Court could draw two inconsistent conclusions from the same record does not prevent a particular finding from being supported by substantial evidence. Culbertson, 30 F.3d at 939. The Court should not reverse the Commissioner's finding merely because evidence may exist to support the opposite conclusion. Buckner, 213 F.3d at 1011; Mitchell v. Shalala, 25 F.3d 712, 714 (8th Cir. 1994); see also Woolf, 3 F.3d at 1213 (the ALJ's determination must be affirmed, even if substantial evidence would support the opposite finding). Instead, the Court must consider "the weight of the evidence in the record and apply a balancing test to evidence which is contradictory." Gavin v. Apfel, 811 F.2d 1195, 1199 (8th Cir. 1987); see also Heino v. Astrue, 578 F.3d 873, 878 (8th Cir. 2009) (quoting Jackson v. Bowen, 873 F.2d 1111, 1113 (8th Cir. 1989)) (same).

The claimant bears the burden of proving his or her entitlement to disability insurance benefits under the Social Security Act. See 20 C.F.R. §§ 404.1512(a), 416.912(a); Thomas v. Sullivan, 928 F.2d 255, 260 (8th Cir. 1991). Once the claimant has demonstrated he or she cannot perform prior work due to a disability, the burden of proof then shifts to the Commissioner to show that the claimant can engage in some other substantial, gainful activity. See Goff v. Barnhart, 421 F.3d 785, 790 (8th Cir. 2005); Eichelberger v. Barnhart, 390 F.3d 584, 591 (8th Cir. 2004); Martonik v. Heckler, 773 F.2d 236, 239 (8th Cir. 1985).

**III.    DECISION UNDER REVIEW**

The ALJ concluded that Elliott was not under a disability within the meaning of the Social Security Administration ("SSA") regulations from June 23, 2008 to the date of the ALJ's decision, December 2, 2010.  (Tr. 21, 30).  In support, the ALJ made the following determinations under the five-step process.  At step one, the ALJ found that Elliott's earnings records supported her allegation that she had been working two to four days a week as a housekeeper but her earnings declined to less than substantial gainful activity in the third and fourth quarters of 2009.  (Tr. 23).

At step two, the ALJ relied on the testimony of the ME and found that Elliott had been treated for intermittent abdominal pain with nausea and had a history of obesity leading to bypass surgery in 1984 and a revision of that surgery in 1999.  (Tr. 24, citing Tr. 635, 652, 654, 621, 645-654).  Elliott also had a twenty-year history of treatment for low back pain and bilateral hand pain requiring carpal tunnel surgery in the early 1990s. (Tr. 24, citing Tr. 401-406).  Additionally, Elliott was diagnosed with an adjustment disorder, rule out summarization disorder characterized by feelings of hopelessness, crying spells, and difficulty sleeping.  (Tr. 24).  Elliott was diagnosed with borderline intellectual functioning based on a full-scale IQ score of 70.  (Tr. 24, 394).  The ALJ found these conditions were medically established and would more than minimally affect Elliott's ability to work.  (Tr. 24).

Because of the evidence the Elliott had possible mental impairments, the ALJ considered the four broad functional areas described in the disability regulations for evaluating mental disorders, and in Section 12.00(C) of the Listing of Impairments, referenced as the "Paragraph B" criteria.  (Tr. 24).  In the first functional area—activities

of daily living—the ALJ found Elliott had mild limitations. (Tr. 24). The ALJ based this determination on the fact that Elliott worked part-time, cleans, dusts, drives a car, goes shopping, vacuums, reads, works on puzzles, brings her clothes to the laundromat, prepares meals and watches television. (Tr. 24).[3]

In the area of social functioning, the ALJ found that Elliott had moderate difficulties. (Tr. 25). The ALJ noted that Elliott stated that she was often irritable and did not like to be around other people. (Tr. 24). On the other hand, she testified at the hearing that she visits with other people. (Tr. 24). The ALJ found that there was no evidence that Elliott had any legal issues as a result of any difficulty in getting along with people and her physician described her as pleasant and cooperative, indicating that she was capable of brief and superficial contact with others. (Tr. 25, citing Tr. 383-386).

The ALJ found that Elliott had moderate difficulty with respect to concentration, persistence or pace. (Tr. 25). The ALJ noted that Elliott complained of difficulty concentrating and completing tasks and testified that she had difficulty understanding things. (Tr. 25). A mental status exam in 2009 indicated that Elliott had impaired memory; however, her speech was goal directed, her persistence and concentration were adequate and she was able to recall five digits forward and five digits backward. (Tr. 25, citing Tr. 383-386). The ALJ noted that Elliott could follow spoken instructions, drive a car and handle her own finances, which would not be possible if she had marked limitations in concentration, persistence or pace. (Tr. 25, citing Tr. 223-234).

---

[3]    The ALJ also stated that Elliott "spends time looking for cans and bottles to turn in for money," citing hearing exhibit 4E (Tr. 227-234). This reference is actually found in hearing exhibit 8F, Tr. 385.

As for the fourth functional area—episodes of decompensation—the ALJ found that there was no evidence of any episodes that could be characterized as decompensation, which have been of extended duration. (Tr. 25).

Because Elliott's mental impairments did not cause at least two "marked" limitations or one "marked" limitation and "repeated" episodes of decompensation, each of extended duration, the ALJ concluded that the "Paragraph B" criteria were not satisfied. (Tr. 25). The ALJ also concluded that the "Paragraph C" criteria were not satisfied. (Tr. 25).

At step three of the analysis, the ALJ acknowledged the severity of Elliott's conditions, but concluded that she did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in the SSA regulations. (Tr. 24-25).

Before considering step four of the analysis, the ALJ determined Elliott's RFC. The ALJ concluded that Elliott could perform light work with the restrictions that she could lift twenty pound occasionally and ten pounds frequently, could stand or walk for six hours in an eight-hour day, and sit for six hours in an eight-hour day with a stand/sit option. (Tr. 25). Elliott was limited to occasional balancing, crouching, kneeling and crawling; occasional power gripping and no continuous fine finger manipulation. (Tr. 25). The ALJ also found that Elliott was limited to unskilled work with only brief and superficial contact with others and requiring minimal quotas. (Tr. 25).

In developing this RFC, the ALJ considered all of Elliott's symptoms and the extent to which her symptoms were consistent with the medical evidence, as well as the opinions rendered by the ME, who reviewed the medical records; the March, 2009,

opinion of State Agency psychological consultant Debra A. Moran, LLC, MA, LP; and the RFC assessment by Mark Nielsen, MD, a Disability Determination Services physician (Tr. 27, citing Tr. 382-387, 438-445). The ALJ gave "great weight" to the opinions of the ME and Dr. Nielsen because their opinions were consistent with the overall record. (Tr. 27). The ALJ found Elliott's subjective reports regarding her limitations to be credible to the extent that she experienced some degree of pain and functional limitations, particularly associated with her history of obesity. (Tr. 26). As a result, the ALJ reduced Elliott's RFC to reflect these limitations. (Tr. 26). The ALJ noted that the record reflected that Elliott lost her job for stealing soda, although Elliott stated that she was fired for her physical impairments and for missing too much work. (Tr. 26 citing Tr. 204-211, 223-234).[4] The ALJ also considered Elliott's testimony that she had abdominal pain several times a week, which lasted from two to six hours a day, headaches and back pain that worsened after standing more than two hours. (Tr. 26).

The ALJ considered the Third Party Function Report submitted by Elliott's husband, Jon Elliott. (Tr. 26, citing Tr. 252-262). The ALJ found her husband's assessment to be well-intentioned and sincere, but noted that he had a financial stake in Elliott's receipt of benefits. (Tr. 26). The ALJ gave greater weight to the medical evidence and observations of Elliott's physicians than to Elliott's testimony and the observations of her husband and did not, therefore, reduce her RFC based on the subjective reports. (Tr. 26).

The ALJ considered Elliott's longitudinal medical history and concluded that her history was not necessarily consistent with her allegations of disability. (Tr. 27). The

---

[4]     Tr. 223-234 do not reflect the information about Elliott's firing. This information is found at Tr. 222.

ALJ found that Elliott had been successfully employed in substantial gainful activity in the twelve months before her alleged onset date, even though she had also received medical treatment for her epigastric pain, and that the objective medical evidence did not reflect any significant worsening of her condition at or around the alleged date of onset.  (Tr. 27).  For example, the fact that Elliott could both work and receive treatment for her condition was not consistent with her claim that she could not work competitively.  (Tr. 27).  In addition, the ALJ found the opinions of Elliott's treating physician, Dr. Mark Topazian, regarding Elliott's ability to work to be inconsistent—Dr. Topazian commented that Elliott would be "occasionally" unable to work, but also stated that her pain prevented her from working competitively.  (Tr. 27).  The ALJ discounted this latter opinion because it was not supported by objective medical evidence in the record and appeared to be based on Elliott's subjective complaints.  (Tr. 28).  The ALJ also found that Dr. Topazian's opinions were inconsistent with the ME's testimony that the physical findings in the record are minimal, the etiology of her pain was unknown despite numerous evaluations, tests and procedures, and the records as a whole indicated that while Elliott's pain episodes were severe, they were unpredictable and could be controlled within a short amount of time with medication.  (Tr. 28).

The ALJ found that the objective medical evidence was fully consistent with the RFC he had derived and inconsistent with disabling levels of pain.  (Tr. 28).  Imaging studies from 2008 revealed an obstructing stone at the right ureterovesical junction, but by October 2008, the stone had passed.  (Tr. 28). At an April, 2009 consultative exam Elliott reported being in no acute distress, and she was noted to be alert, oriented, pleasant and cooperative.  (Tr. 28, citing Tr. 401-406).  The ALJ acknowledged that

Elliott had experienced pain, but noted that her pain was relieved with a single sustained dose of Oxycodone. (Tr. 28). At a March, 2009 psychological exam, Elliott described her pain as severe, but episodic and denied any difficulty completing her work chores. (Tr. 28, citing Tr. 382-387). At an August, 2009 exam, Elliott reported that her abdominal pain was less of an issue. (Tr. 28, citing Tr. 654). In May, 2010 Elliott sought treatment for her abdominal pain, which was lasting three to four hours and occurring three to four times a week, however, the imaging studies showed only a small hiatal hernia but otherwise an unremarkable esophagus. (Tr. 28, citing Tr. 648).

The ALJ considered a letter from Dr. Michael Sarr, who indicated that Elliott was unable to work full-time because of her abdominal pain. (Tr. 28). The ALJ did not give this letter much weight because it was inconsistent with another letter Dr. Sarr wrote in the same month in which he opined that Elliott did not meet the criteria for disability benefits. (Tr. 29, citing Tr. 634, 635).

With respect to Elliott's back pain, the ALJ considered the ME's testimony that x-rays showed only mild osteoarthritic changes and that there was no evidence of any associated neurological defects. (Tr. 29, citing Tr. 400, 403). The ALJ also noted that at a physical consultative exam in April, 2009, that Elliott indicated that although she had back pain at the end of the day, she was always able to do her work. (Tr. 29, citing Tr. 382-387, 401-406). That examination showed that Elliott had only slight tenderness to palpation at the lumbosacral junction, straight leg rise was negative, and Elliott was able to heel/toe walk without difficulty. (Tr. 29).

The ALJ considered Elliott's history of carpal tunnel syndrome but found no further limitations documented in the medical evidence. At the April, 2009 consultative

exam, there was a slight decrease in pinch strength, but Phalen's and Tinel's signs were negative bilaterally.  (Tr. 29).

`        At step four of the evaluation process, the ALJ found that Elliott lacked the RFC to perform any past relevant work as a cashier (a light, unskilled job), dishwasher (a medium unskilled job) and waitress (a light, semiskilled job).  (Tr. 29).

At the fifth step of the analysis, the ALJ determined that Elliott was "not disabled" within the meaning of the SSA regulations.  (Tr. 30).  In reaching this conclusion, the ALJ considered Elliott's age, educational attainment, RFC and work experience, as well as the extent to which Elliott's limitations eroded her ability to perform a full range of unskilled, light work.  (Tr. 30).  Relying on the VE's opinion, the ALJ found that Elliott could perform the jobs of stuffer[5] or garment bagger.  (Tr. 30).  The VE testified that there are 9,000 stuffer jobs and 3,000 garment bagger jobs in Minnesota that the hypothetical individual could perform.  (Tr. 30).

## IV.    THE PARTIES' CROSS-MOTIONS FOR SUMMARY JUDGMENT

### A.    Elliott's Motion for Summary Judgment

Elliott challenged the ALJ's decision on the following grounds.  First, Elliott contended that the ALJ erred by failing to properly consider her complaints of pain complaints and the effect of the pain on her ability to perform a competitive job on a sustained basis.  Plaintiff's Memorandum ("Pl. Mem."), p. 11 [Docket No. 12].  According

---

[5]    The Dictionary of Occupational Titles ("DOT"), 731.685-014 defines "stuffer" as one who "tends machine that blows filler into stuffed-toy shells; inserts precut supporting wire into shell.  Places shell opening over stuffing machine nozzle.  Depresses pedal to blow cotton or chopped foam rubber filler into shell to impart shape to toy.  Placed stuffed toy in tote box.  Records production.  May stuff toys by hand."
http://www.occupationalinfo.org/73/731685014.html

to Elliott, the ALJ conceded that her condition was such that it caused the severe upper quadrant pain she described.  Id., p. 12 (citing Tr. 27).[6]  Further, Elliott's subjective reports of severe pain were consistent with the observations and opinions of her treating physician, Dr. Topazian.  Id., p. 13.  Elliott argued that she was forced to leave her job of twenty-nine years as a canteen worker at the Mayo Clinic as a result of her disabilities and has since worked part-time as a housekeeper, indicating that she was not using her condition to stop working, but was attempting to work in a setting that allowed her the flexibility to deal with her severe abdominal pain attacks.  Id.  In short, Elliott's subjective complaints of severe and debilitating pain were consistent with the medical and employment history evidence and the ALJ erred by failing to credit her subjective reports of pain.  Id., p. 14.

Second, Elliott contended that the ALJ erred by failing to incorporate Elliott's severe pain symptoms and her inability to work into the hypothetical he posed to the VE.  Id.  Further, the ALJ failed to include Elliott's borderline intellectual functioning in to in his hypothetical and failed to consider her intellectual capacity in connection with her ability to work.  Id., p. 15.

Lastly, Elliott argued that the ALJ erred in failing to give appropriate weight to the opinion of her treating physician, Dr. Topazian.  Id., pp. 15-18.  Elliott argued that there was nothing "inconsistent" in Dr. Topanzian's opinions and that the ME acknowledged that Elliott's pains were sometimes frequent and sometimes occasional.  Pl. Mem., p. 16 (citing Tr. 54).  Further, the ME testified that there was no evidence that Elliott's

---

[6]    The ALJ wrote:  "The record reveals that claimant successfully engaged in substantial gainful activity in the twelve months prior to her alleged onset date, despite medical treatment during that period for severe epigastric and right quadrant pain."  (Tr. 27).

physicians considered her to be a malingerer, which Elliott construed as a sign that their opinions should have been given greater weight. Id., pp. 17-18.

As a result of these alleged errors by the ALJ, Elliott sought a remand for a determination of benefits. Id., p. 18.

### B.    Commissioner's Motion for Summary Judgment

The Commissioner argued that substantial evidence supported the ALJ's evaluation of the medical opinion evidence. Defendant's Memorandum of Law in Support of Motion for Summary Judgment ("Def. Mem."), pp. 6-7 [Docket No. 15]. According to the Commissioner, the ALJ properly weighed Dr. Topazian's opinions. Id., p. 7 (citing Tr. 28). The Commissioner noted that although Elliott argued that Dr. Topazian "consistently" stated that Elliott was not capable of full-time work, there was no other evidence in the record to indicate that was so. Id., p. 8. Further, Dr. Topazian repeatedly noted the episodic nature Elliott's pain. Id., p. 9. Therefore, the ALJ did not err in concluding that Dr. Topazian's opinion that Elliott was not capable of full-time work was not supported by the record as a whole. Id.

The Commissioner also rejected Elliott's argument that the ME's testimony regarding the severity of her pain was consistent with Dr. Topazian's opinion that she could not work full-time. Id. The ME testified regarding Elliott's subjective complaints of pain and noted that there was no organic basis for Elliott's complaint of abdominal pain. Id. (citing Tr. 56-57, 635). Consequently, Elliott failed to show how the ME's testimony supported Dr. Topazian's conclusion that she was precluded from working. Id.

As for the ALJ's assessment of Elliott's subjective reports of pain, the Commissioner contended that the ALJ considered Elliott's daily activities, the

inconsistency of her complaints, her positive response to medication, the objective medical evidence and the evidence that she lost her job at the Mayo Clinic for stealing, not because of her disabilities when weighing her credibility. Id., p. 11. Further, the lack of evidence that Elliott was a malingerer was not the same as finding that her testimony regarding her pain was credible. Id., p. 12 (citing Barkhuff v. Astrue, Civ. No. 10-1975 (SRN/TNL), 2011 WL 3648244 at *16 (D. Minn. Jul. 26, 2011)). In Elliott's application for benefits and at the hearing, she stated that she worked part-time, drove, cleaned, dusted, went shopping, vacuumed, read, working on puzzles, washed her clothes at the laundromat, cooked and watched television. Id. (citing Tr. 24, 43-45, 229-231, 244, 246, 383, 385). She also looked for cans and bottles to turn in for money. Id. (citing Tr. 24, 385). Consequently, the ALJ properly relied on Elliott's admitted activities of daily living to determine that her subjective reports of pain were not completely credible. Id., p. 13.

The Commissioner submitted that the hypothetical question the ALJ posed to the VE was proper and incorporated the ALJ's RFC assessment, which in turn accounted for Elliott's abdominal pain. Id., p. 14. With respect Elliott's contention that the ALJ should have incorporated into his hypothetical a limitation to "simple, no more than one or two step tasks" because of her limited intellectual functioning, the Commissioner pointed out that the ALJ's limitation of Elliott to unskilled work, by definition limited her to simple work with few steps. Id., p. 15 (citing 20 C.F.R. §§404.1568, 416.968). Furthermore, to the extent Elliott argued that the ALJ failed to properly develop the record regarding her intellectual functioning, the Commissioner maintained that Elliott failed to indicate what gaps or inconsistencies in the record on that issue the ALJ failed

to develop, and never alleged that her mental functioning was an issue in her application for benefits. Id. Therefore, Elliott failed to show how the ALJ erred in his hypothetical to the VE. Id., p. 16.

**C.** **Elliott's Reply**

Elliott replied to the Commissioner's motion for summary judgment. Plaintiff's Reply Memorandum Opposing Defendant's Motion for Summary Judgment ("Pl. Reply") [Docket No. 16]. Elliott argued that the Commissioner misconstrued and took out of context Dr. Topazian's opinion that her abdominal pain was episodic and did not prevent her from working. Id., p. 1. Elliott pointed to a report by Dr. Topazian dated December 19, 2008, in which he stated that Elliott "has abdominal pain several days a month that prevents her from working-is otherwise able to work without restrictions." Id., pp. 1-2. Therefore, Dr. Topazian's opinion was actually that Elliott's pain prevented her from working several times a month. Id. While conceding the episodic nature of her abdominal pain, Elliott argued that the medical records indicate that the attacks have never gone away completely and as a result, she is unable to work eight hours a day, five days a week without undue absences. Id., pp. 2-3.

Elliott also contested the Commissioner's assertion that her pain symptoms were inconsistent with her activities of daily living, pointing to her testimony at the hearing in which she stated that she did only "light" housework, "a little" cooking and that her ability to shop was limited. Id., p.3. Elliott indicated that her husband helped her dress as she was unable to bend over because her back and stomach hurt; unless her husband helped with cooking, she had to rely on frozen dinners, canned food or a sandwich; and when she went grocery shopping, it could take two to three hours. Id., p. 4. Elliott

contended that contrary to the ALJ's conclusion, there was nothing inconsistent between her activities of daily living and her severe pain symptoms. Id.

Lastly, Elliott argued that evidence of her loss of employment for stealing should not be used to impugn her credibility because she believed that she was actually fired for calling in sick too much, not because she stole soda. Id. (citing Tr. 236).

## V. ELLIOTT'S RELEVANT MEDICAL AND PSYCHOLOGICAL HISTORY

### A. Medical Evidence

At the time of the ALJ's decision, Elliott was forty-nine years old and was working two to four days a week as a housekeeper. (Tr. 23). Elliott had wages of $3,455 in the second quarter of 2009, $2,000 in the third quarter and $2,771 in the fourth quarter. (Tr. 195-199). Before the onset of her disability, Elliott had worked for twenty-nine years at a canteen at the Mayo Clinic. (Tr. 29, 215). Elliott has a high school education and was living with her husband at her mother's house. (Tr. 383). At the time of the hearing Elliott was taking pain medication. (Tr. 42).

Elliott began experiencing episodes of epigastric pain in 2004. (Tr. 524, 527). Elliott underwent a surgical sphincteroplasty on April 19, 2005. (Tr. 510). The surgery was intended to address episodes of mid-abdominal and right upper quadrant pain, which Elliott reported were interfering with her work and home life. (Tr. 515, 519). The surgery was uneventful. (Tr. 516, 520, 521, 522).

Beginning in 2005, she began to have episodes of epigastric pain, which would last for five to six hours. (Tr. 510, 609, 611). Between these more major episodes, she would have milder attacks lasting for several hours, once or twice a week. (Tr. 510). In January, 2007, Elliott was seen in the Emergency Department at the Mayo Clinic for

upper epigastric and right upper quadrant abdominal pain. (Tr. 596). While she was waiting to be seen in the Emergency Department, her pain resolved and by the time she was seen by a physician she was virtually pain free. (Tr. 596). Elliott saw Dr. Mark Topazian about the attacks after she had been seen in the emergency room. (Tr. 510-512). Dr. Topazian ruled out biliary or pancreatic duct obstruction, internal hernia or partial obstruction. (Tr. 511). In August 2007, Elliott saw Dr. Topazian after an unsuccessful attempt at a balloon enteroscopy, which was conducted to diagnose her abdominal pain. (Tr. 360). Dr. Topazian noted that Elliott's pain occurred typically once every week or so and lasted for three to four hours. (Tr. 360). At its maximum, Elliott's pain reached a severity of five out of ten, but responded to oxycodone. (Tr. 360).

Elliott saw Dr. Topazian on February 27, 2008, when she reported that she continued to have episodes of abdominal pain lasting about six hours, though between episodes she felt well. (Tr. 358). Dr. Topazian discussed a balloon endoscopy with Elliott, but she wanted to think it over. (Tr. 358).

In April, 2008, Dr. Topazian saw Elliott for an office visit for a work status evaluation. Dr. Topazain noted that Elliott's father had passed away a few months before, her mother had been ill and her 13-year old dog had died. (Tr. 356). Dr. Topazian diagnosed Elliott with grief reaction and took her off work for eleven days, advising that she could return to work without restrictions at the end of that time. (Tr. 357). In August of 2008, Dr. Topazian saw Elliott and noted that she continued to have intermittent episodes of steady upper abdominal pain lasting for six to eight hours, somewhat shorter if she took sustained release Oxycodone at the start of an attack. (Tr. 354).

Dr. Topazian referred Elliott for treatment of kidney stones in 2008, for which Elliott underwent surgery on September 11, 2008. (Tr. 344-346). The surgery was uneventful. (Tr. 346). On October 9, 2008, Elliott was seen in the emergency room of the Winneshiek Medical Center in Decorah, Iowa for abdominal and back pain. (Tr. 456). Elliott was treated with Lortab, a narcotic, and released. (Tr. 457). Elliott was seen at the same facility on April 21, 2009 for right elbow pain. Elliott was advised to take Aleve twice daily. (Tr. 458). Elliott was again seen in the Winneshiek Medical Center Emergency Room on July 15, 2009 for right side pain. (Tr. 460). The ER physician noted that Elliott had been managing her pain with Oxycodone, but was out of her prescription. (Tr. 460). Elliott was seen again at the ER on November 7, 2009, after having an episode of abdominal pain that lasted eighteen hours. At the time of her discharge from the ER, Elliott's pain was a zero to 1, without any medical intervention. (Tr. 463).

On October 14, 2008, Elliott saw Dr. Topazian because she had run out of pain pills following "about" seven episodes of abdominal pain. (Tr. 380). Dr. Topazian noted that Elliott was under increased stress as a result of her husband and mother being ill. (Tr. 380).

Elliott saw Dr. Topazian on November 14, 2008. (Tr. 378). Dr. Topazian noted that Elliott had a couple of episodes of steady epigastric pain, which he described as having no clear medical diagnosis. (Tr. 378). Dr. Topazian's notes indicated that Elliott was under a considerable amount of stress, having lost her job at the Mayo Clinic, and dealing with the emotional aftermath of her father's death and the sale of her home. (Tr. 378). As to the social issues Elliott was dealing with, Dr. Topazian stated that Elliott

wanted to work again and that "she does have some ground for disability in that several days a month she will likely be unable to work due to episodes of upper abdominal pain. I will review the circumstances of her termination at Mayo with staff here and see if there is an opportunity for her to regain Mayo employment. I also told her I'd be happy to write a disability letter explaining her medical limitations." (Tr. 378).

In December 2008, Elliott saw Dr. Topazian following three episodes of upper abdominal pain requiring treatment with Oxycodone. (Tr. 376). Dr. Topazian noted that Elliott had "an almost daily aching discomfort across the epigastrium and right upper quadrant." (Tr. 376). Dr. Topazian contacted the administrative staff to see if Elliott could get her job back, but was told that she would not be offered another job at Mayo. (Tr. 376). Dr. Topazian indicated that he would "be happy to fill out disability forms with regard to [Elliott's] medical situation. (Tr. 376).

Dr. Topazian saw Elliott on February 23, 2010. (Tr. 452). Dr. Topazian noted that Elliott had recently lost a job due to tennis elbow, and that she continued to have episodes of pain, which interrupted her usual activities. (Tr. 452). Rather than the abdominal pain, however, Elliott was having arm and back pain, sore ribs and headaches. (Tr. 452). She had one episode of abdominal pain and received a prescription for Vicodin from an emergency room physician. (Tr. 452). Dr. Topazian noted that Elliott and her husband were living in a retirement home because of her husband's disabilities and that she wanted to work. (Tr. 453).

On March 23, 2010, Mayo Clinic surgeon Michael Sarr (who performed Elliott's sphincterotomy surgery) (Tr. 513) wrote a letter to the SSA in support of Elliott's disability application. (Tr. 472). Dr. Sarr described Elliott as an "unfortunate lady with

an unfortunate social situation [who] has had a terrible recurrent problem with chronic abdominal pain possibly related to sphincter of Oddi dysfunction." Dr. Sarr stated that Elliott had chronic, persistent, unexplainable abdominal pain that interferes with all of her social activities as well as with her activities at work. (Tr. 472).

On June 2, 2010, Dr. Topazian wrote a letter in connection with Elliott's application for benefits summarizing his impressions and recommendations. (Tr. 628-629). Dr. Topazian stated that Elliott was "occasionally" unable to work because of her pain episodes, which occur unpredictably. (Tr. 628). On June 8, 2010, Dr. Sarr also wrote a letter regarding Elliott in connection with her benefits application. (Tr. 635). Dr. Sarr stated that he did not think that Elliott could work reliably on a full-time basis due to her episodes of abdominal pain. (Tr. 635). However, the next day Dr. Sarr wrote to Elliott and told her that he did not believe that she met the criteria for total disability and emphasized strongly that she had to maintain her part-time work, even if it meant going to work when she wasn't feeling well. (Tr. 634)

B. **State Agency Physicians' Opinions**

1. **Physical RFC**

State agency reviewing physician Dr. Mark Nielsen completed a physical RFC assessment of Elliott on May 27, 2009 and concluded that she could occasionally lift 20 pounds, frequently lift 10 pounds, stand and/or walk about six hours in an eight hour workday, sit about six hours in an eight hour work day and had an unlimited ability to push and/or pull, including the operation of hand and/or foot controls. (Tr. 438-448). In addition, Dr. Nielsen opined that Elliott could frequently climb stairs and balance, occasionally stoop, kneel, crouch and crawl but could never be on a ladder, rope or

scaffold.  (Tr. 440).  Dr. Nielsen noted that Elliott had no manipulative limitations except for a limitation on frequent power gripping and no visual or communicative limitations.  (Tr. 441-442).  As to environmental limitations, Dr. Nielsen noted that Elliott should avoid concentrated exposure to extreme cold, wetness, noise, vibrations and hazards, such as machinery and heights.  (Tr. 442).

### 2.     Psychological Assessment

Elliott was referred to psychologist Debra Moran for an evaluation in March, 2009.  (Tr. 383-386).  Moran noted Elliott's employment history, which included a new job at a liquor store where she would be working a maximum of 53 hours per month, as well as a new job at a hospital laundry where she would be working six to seven hours a day, twelve to thirteen hours per month.  (Tr. 383).  Moran reviewed Elliott's medical history and also noted that Elliott reported experiencing many losses of late, including loss of her job and having to sell many of her possessions.  (Tr. 385).  Elliott told Moran that she gets up at 6:00 a.m. and may watch some television before she and her husband go out to look for cans and bottles as a source of income.  (Tr. 385).  When she does not have a job, she may spend the afternoon also looking for cans and bottles. (Tr. 385).  Elliott stated that she and her husband shop for groceries and she washes clothing at the laundromat twice a week.  (Tr. 385).

Moran found Elliott's speech goal directed and intelligible.  (Tr. 385).  Elliott's thought process was intact but her memory was impaired.  (Tr. 385).  Elliott's judgment and insight was intact.    (Tr. 385).    Moran concluded that Elliott displayed some symptoms of depression and anxiety, which seemed to relate to her current stressors. (Tr. 386).  Moran further concluded that Elliott's ability to tolerate workplace stressors

may at times be limited.  (Tr. 386).  Finally, Moran noted that Elliott was able to interact appropriately with her, suggesting that she had the ability to do so in a work environment.  (Tr. 386).

State agency reviewing psychologist P.E. Shields, Ph.D reviewed Elliott's records from June 23, 2008 to May 12, 2009, and concluded that her impairments, while severe, did not meet or equal the listings.  (Tr. 422).  Dr. Shields noted the presence of adjustment disorder and somatization disorder, neither of which precisely satisfied a diagnostic criteria.  Dr. Shields found Elliott to be mildly restricted in her activities of daily living, moderately limited in maintaining social functioning, moderately limited in maintaining concentration, persistence or pace, and as having had one or two episodes of decompensation, each of extended duration.  (Tr. 413-421).  Dr. Shields found Elliott had low verbal and reading skills, but that she had the ability to do her past work as a cashier.  (Tr. 422).

Dr. Shields completed a Mental RFC on Elliott in which he stated that Elliott was not significantly limited in her understanding and memory, except that she was markedly limited in her ability to understand and remember detailed instructions.  (Tr. 424).  Dr. Shields found Elliott not significantly limited in her concentration and persistence, except that she markedly limited in her ability to carry out detailed instructions and her ability to work in proximity to and in coordination with others, without being distracted by them; and moderately limited in her ability to complete a normal workweek without interruptions from psychologically-based symptoms or perform at a consistent pace without an unreasonable number of breaks.  (Tr. 423-424).

Dr. Shields found Elliott to be moderately limited in her ability to interact with the public, accept instructions and interact with supervisors, and get along with co-workers. (Tr. 425). Lastly, Dr. Shields found Elliott moderately limited in her ability to respond appropriately to changes in the work place but otherwise not significantly limited in her adaptive abilities. (Tr. 425).

### 3. Consultative Examination

Elliott was seen for a consultative examination by Mark Martin, D.O. on April 16, 2009. (Tr. 401-405). Elliott presented with low back pain and finger and hand pain. (Tr. 402). Elliott told Dr. Martin that "she can always do her work" but at the end of the day her back hurt. (Tr. 402). Dr. Martin diagnosed Elliott with bilateral hand pain and chronic low back pain with mild degenerative disease. (Tr. 403). Dr. Martin recommended that Elliott refrain from having to do repetitive firm gripping and fine manipulating. (Tr. 403).

## VI. HEARING TESTIMONY

### A. Elliott's Testimony

At the administrative hearing Elliott testified that she had pancreas and liver problems that resulted in upper stomach pains that lasted between four and eight hours in a day. (Tr. 42). Elliott reported that she took hydrocodone to control the pain. (Tr. 42, 51). Elliott stated that she was up four or five times a night and could sleep only two hours at a time. (Tr. 43). Elliott further testified that her appetite was fair to poor. (Tr. 43). As to her functioning, Elliott reported that she did light housework, "just a little" cooking, and that she went shopping, although it took an hour or so to do. (Tr. 44). Elliott was driving about thirty miles a week, including a ten-mile round trip commute to

her work.  (Tr. 44).  As hobbies, Elliott testified that she watched television and did puzzles.  (Tr. 45).  Elliott was working part-time at a laundromat where she was washing clothes and dusting.  (Tr. 45-46).  This job required Elliott to be on her feet.  (Tr. 46). Elliott was earning between $280 and $300 dollars every two weeks.  (Tr. 46).  Elliott stated that she could walk for less than an hour and would have to walk or sit down within two hours after being on her feet.  (Tr. 47).  After two hours, Elliott's back would start to hurt and her legs would "start to go." (Tr. 47).  Elliott told the ALJ that her doctors told her she should try to work, as it was her only means of living.  (Tr. 47).

Elliott stated that it was "pretty easy" for her to lift five pounds but that she would struggle to lift ten pounds.  (Tr. 48).  As to her cognitive functioning, Elliott reported that her thinking process "usually" worked for her.  (Tr. 48).

Under questioning from her attorney, Elliott stated that she had "severe" stomach pains three to four times a week, with the pains so severe that she couldn't sit, stand or lie down.  (Tr. 50).  These pains lasted up to eight hours and could be as short as two hours.  (Tr. 51).  Because of the pain, Elliott reported that she while she could stand, she was bent over "like someone just hit" her.  (Tr. 51).

As to her medical history, Elliott testified that she was taking hydrocodone for pain and Cymax for abdominal spasms.  (Tr. 52).  Elliott had gallbladder surgery in 1983 or 1984.  Doctors tried to diagnose her abdominal pain, but told Elliott there was nothing they could do for her pain and she would just have to "live with it."  (Tr. 53).

At the time of the hearing, Elliott had been working part-time for a year-and-a-half and testified that she lost approximately six days of work because of her pain.  (Tr. 53). Elliott's work provided some flexibility, so she could be absent if she knew in advance

that she was sick, but that sometimes she had to work even though she did not feel well.  (Tr. 54).

## B.    The ME's Testimony

The ME testified that Elliott had a diagnosis of depression; tobaccoism; intermittent abdominal pain with some nausea; a history of gastric bypass surgery in 1984 and a revision of the surgery in 1999; treatment for low back pain; mild osteoarthritic changes; a history of carpal tunnel release surgery; and a slight decrease in pinch strength.  (Tr. 54-55).  The ME described Elliott's case as "primarily a pain case and the physical findings are minimal."  (Tr. 55).  The ME opined that with the lack of physical findings, the record pointed to a light residual functional capacity, with the inability to do anything more than occasional power gripping and inability to do continuous fine manipulation with her hands.  (Tr. 55).  The ME noted that this was primarily a pain case and the physical findings were minimal.  (Tr. 55).  The ME acknowledged Elliott's history of low back pain of twenty years duration and that x-rays showed mild osteoarthritic changes, but without any associated neurological deficit.  (Tr. 55).

Elliott's attorney asked the ME about Elliott's history of abdominal pain, which Elliott described as occurring several times a day or several times a week, and lasting two to eight hours.  (Tr. 56).  The ME acknowledged that there were regular reports of abdominal pain, but that Elliott's physicians believed it to be a functional problem, i.e., lacking an organic basis.  (Tr. 56-57).  The ME acknowledged that over the years Elliott had undergone numerous tests, evaluations and procedures but that her doctors had been unable to make any specific diagnosis.  (Tr. 57).  The ME testified that despite the

27

lack of an organic basis for Elliott's abdominal pain, there was nothing in the record to suggest that she did not have pain or that she was malingering. (Tr. 57).

###    C.    The VE's Testimony

The ALJ asked the VE to assume a fifty-year-old person with a high school education who is impaired by depression, chronic pain, obesity, status post history of obesity, status post bypass procedures, lower back pain, bilateral hand pain for which she takes medication and depression and anxiety, for which she also takes medication. (Tr. 58). This hypothetical person could not carry or lift more than twenty pounds, stand and walk six hours out of an eight hour day, sit for six hours with a sit/stand option, and had limited and occasional balancing, crouching, kneeling and crawling and only occasional power gripping. (Tr. 58-59). This person would not be required to have continuous fine finger manipulation and, because of depression and anxiety, only brief and superficial contact, do unskilled work with minimum quotas. (Tr. 59). The VE testified that an individual in those circumstances could not perform past work. (Tr. 58). The VE testified that such an individual could perform the work of a stuffer or garment bagger, which are light, unskilled positions. (Tr. 59). The VE further testified that two day per month of absenteeism would be acceptable in these positions. (Tr. 59). The VE noted that a sit/stand option is not addressed in the DOT but that based on his experience with the positions, such an option was available. (Tr. 60). Under questioning from Elliott's attorney, the VE stated that an individual working in these positions would have to be able to do them continuously in the course of an eight hour day with no more than the usual number of breaks. (Tr. 61).

## VII.    THIRD PARTY FUNCTION REPORT

Elliott's husband, Jon Elliott, submitted a third party function report on Elliott's behalf.  (Tr. 255-262).  Elliott reported that his wife watched television "all the time" and picked up cans (to turn in for cash).  (Tr. 256).  Further, Elliott noted that his wife had "no problem" with personal care, she cooked weekly, dusted, did laundry and mowed the lawn one to three hours a week.  (Tr. 257).  Elliott stated that his wife was driving, walking and shopping, but that generally she was "doing less" because of her illness. (Tr. 259)

## VIII.    DISCUSSION

### A.    The ALJ's Consideration of Elliott's Subjective Complaints of Pain

Elliott contended that the ALJ erred by failing to find Elliott disabled as a result of her severe pain symptoms.  Pl. Mem., p. 13.  As a result, Elliott sought a remand for determination of benefits.  Id., p. 14.

"'An ALJ may not discount a claimant's allegation of disabling pain solely because the objective medical evidence does not fully support' the allegations."  Olson v. Astrue, Civ. No. 11-3491, 2012 WL 6861346 at *15 (D. Minn. Dec. 19, 2012) (quoting Goff, 421 F.3d at 792).  In considering a claimant's subjective complaints of disability, the ALJ must assess the claimant's credibility, applying the factors set forth in Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984) (vacated on other grounds by Bowen v. Polaski, 476 U.S. 1167 (1986)).  The Polaski factors require the ALJ to fully consider all the evidence presented relating to a claimant's subjective complaints, including prior work record, and observations of third parties and treating and examining physicians relating to such matters as:

1. the claimant's daily activities;
2. the duration, frequency, and intensity of the pain;
3. precipitating and aggravating factors;
4. dosage, effectiveness, and side effects of medication; and
5. functional restrictions.

Id.; see also Cox v. Apfel, 160 F.3d 1203, 1207 (8th Cir. 1998) (same). "Other relevant factors include the claimant's relevant work history and the absence of objective medical evidence to support the complaints." Cox, 160 F.3d at 1207. The ALJ may consider whether there is a lack of objective medical evidence to support a claimant's subjective complaints, but the ALJ cannot rely solely on that factor in assessing the credibility of plaintiff's subjective complaints. Ramirez v. Barnhart, 292 F.3d 576, 581 (8th Cir. 2002). "An ALJ may discount a claimant's subjective complaints of pain only if there are inconsistencies in the record as a whole." Johnson v. Chater, 87 F.3d 1015, 1017 (8th Cir. 1996) (citing Smith v. Shalala, 987 F.2d 1371, 1374 (8th Cir. 1993.)) For example, the ALJ may find a claimant's subjective complaints inconsistent with daily activities, lack of treatment, demeanor, and objective medical evidence." Jones v. Chater, 86 F.3d 823, 826 (8th Cir. 1996); see also Cox, 160 F.3d at 1207.

If the ALJ rejects a claimant's complaint of pain, "the ALJ must make an express credibility determination detailing his reasons for discrediting the testimony." Cline v. Sullivan, 939 F.2d 560, 565 (8th Cir. 1991). "It is not enough that inconsistencies may be said to exist, the ALJ must set forth the inconsistencies in the evidence presented and discuss the factors set forth in Polaski when making credibility determinations." Id. But the failure to address each of the Polaski factors separately does not render the ALJ's determination invalid. See Young v. Apfel, 221 F.3d 1065, 1068 (8th Cir. 2000) (finding that although the ALJ had not explicitly articulated his credibility determination,

she did so implicitly by evaluating the claimant's testimony under the Polaski factors and by identifying inconsistencies between the claimant's statements and evidence in the record); see also Lowe v. Apfel, 226 F.3d 969, 972 (8th Cir. 2000) (holding that ALJ was not required to methodically discuss each Polaski consideration, so long as he acknowledged and examined those considerations).

Here, the ALJ found that there was credible evidence that Elliott experienced a degree of pain and functional limitation that required him to reduce her RFC. (Tr. 26). However, the ALJ did not find that Elliott was incapable of performing any work because of inconsistences in the record and Elliott's lack of credibility. (Tr. 27). Although the ALJ did not explicitly mention the Polaski factors, the Court found that his decision did, in fact, address the factors. See Byman v. Astrue, Civ. No. 12-385 (RHK/JSM), 2013 WL 943485 at *20 (D. Minn. Feb. 15, 2013) ("[T]he ALJ was not required to use the words 'Polaski factors' in order for his analysis to be correct under the Polaski framework."). For example, the ALJ found that Elliott was able to maintain her employment despite her abdominal pain.[7] (Tr. 27). Further, at the time of the hearing Elliott was working part-time, keeping up with household chores, driving, shopping, vacuuming, and looking for cans and bottles to turn in for money, sometimes twice a day. (Tr. 43-45, 385). In addition, although Dr. Sarr wrote a letter in 2010 stating that Elliott was unable to work full time as a result of her stomach pain, the ALJ explained that he did not give the letter great weight, as it conflicted with a letter Dr. Sarr wrote the

---

[7]     Elliott stated in her brief that she was forced to leave her employment at the Mayo Clinic as a result of her severe pain symptoms. Pl. Mem., p. 13. Yet the evidence in the record indicates that she was let go for stealing soda. (Tr. 222). Elliott's subjective belief was that her firing for taking soda was a pretext for letting her go because of her illness, but there are no employment records or other evidence to support this belief.

next day in which he told Elliott that she did not meet the criteria for disability benefits. (Tr. 29, citing Tr. 635). In fact, Dr. Sarr and Dr. Topazian went to great lengths to try to get Elliott reinstated at her <u>full time job</u> at the Mayo Clinic. (Tr. 639, 643-644). Additionally, Dr. Sarr is a surgeon with no particular familiarity with the SSA regulations. Therefore, the ALJ was entitled to give greater weight to the ME's opinion than to Dr. Sarr's opinion.

The ALJ noted particularly that Elliott had been engaged in substantial gainful employment in the twelve months before her alleged onset of disability at the same time she was receiving treatment for her epigastric and right quadrant pain. (Tr. 27). There was no evidence of any worsening Elliott's condition at the time of her alleged onset of disability, indicating that she could work competitively now. (Tr. 27). Furthermore, Dr. Topazian's opinions were at odds with the ME's opinion that the physical findings were minimal, the etiology of Elliott's pain was unknown and her abdominal pain occurred sometimes frequently and other times occasionally, which is well supported by the record. (Tr. 28, 55-56, 382-387). Additionally, Elliott's pain could be controlled in a short amount of time with pain medication. (Tr. 28, 354, 360, 628). The ALJ considered the objective medical evidence regarding Elliott's abdominal pain and her treating physicians' efforts to diagnose the source of the pain, the responsiveness of her pain to medication, her back pain and the fact that Elliott did not appear to be hampered by back pain in connection with her work and her carpal tunnel syndrome. (Tr. 28-29). Based on the medical evidence, the ALJ concluded that while Elliott had mild restrictions regarding her activities of daily living, she was not disabled.

The ME's testimony that Elliott was not a malingerer, (Tr. 57), did not preclude the ALJ from concluding that, based on the record as a whole, Elliott's pain did not render her totally disabled. "A malingerer is '[o]ne who pretends to be ill or suffering from a nonexistent disorder to arouse sympathy' or '[o]ne who pretends slow recuperation from a disease once suffered in order to continue to receive benefits of medical insurance and work absence.'" <u>Miller v. Astrue</u>, Civ. No. 3:10-01027, 2011 WL 6119170 at *9, fn. 6 (D. Or. Dec. 7, 2011) (quoting Taber's Cyclopedic Medical Dictionary 1396 (D. Venes et.al. eds. 2009). The ALJ never stated that Elliott was feigning illness. Rather, the ALJ concluded that based on the record as a whole, Elliott's subjective pain symptoms did not render her totally disabled. The ALJ particularly noted Elliott's long work history in assessing her credibility. (Tr. 30). Previous to her application for benefits, Elliott had a long and stable work history and since her application had been working two jobs. (Tr. 29). Despite back pain, Elliott had reported that she was able to do her work. (Tr. 29, 402-403). The ALJ also weighed Elliott's assertion that she was experiencing disabling pain against her description of her pain as episodic and as not interfering with her work chores. (Tr. 28, citing Tr. 382-387).

This Court will not substitute its opinion for the ALJ's determinations regarding Elliott's credibility where the ALJ made specific findings regarding the factors that entered into his decision to find Elliott's subjective complaints not wholly credible, and these findings are supported by the record as a whole. Under these circumstances, the Court finds no reason to disturb the ALJ's credibility findings.

**B.     The ALJ's Hypothetical Questions to the VE**

Elliott next argued that the ALJ failed to account for her abdominal pain in the hypothetical question he posed to the VE.  Pl. Mem., p. 14.  The ALJ did, in fact, ask the VE to assume that the hypothetical individual was impaired by chronic pain.  (Tr. 58).  In addition, the hypothetical included all of the limitations described in Dr. Nielsen's RFC assessment.  (Tr. 58-59).  The ALJ did not find that the record as a whole supported Elliott's claim that she was totally disabled by her abdominal pain, but he reduced her RFC to reflect the degree of pain and functional limitations he found were supported by substantial evidence in the record as a whole.  (Tr. 26).  Therefore, this Court finds no error in the ALJ's reliance on the VE's testimony regarding Elliott's ability to work as a stuffer or garment bagger.  See Page v. Astrue, 484 F.3d 1040, 1045 (8th Cir. 2007) (ALJ properly relied on VE's testimony that included all of claimant's impairments which were supported by the record); Gilbert v. Apfel, 175 F.3d 602, 604 (8th Cir. 1999) ("in posing hypothetical questions to a vocational expert, an ALJ must include all impairments he finds supported by the administrative record.").

Elliott also argued that it was error for the ALJ not to include in his hypothetical any limitation with respect to Elliott's ability to perform only simple, "no more than one or two step tasks" as a result of her borderline intellectual functioning.  Pl. Mem., p. 15. For starters, beyond the limitation to simple tasks, Elliott failed to identify how her intellectual functioning affected her ability to work.  She did not, for example, indicate that her ability to work was affected by her reading comprehension nor did she submit any evidence in connection with her application regarding the impact of her intellectual functioning on her employment prospects.   Furthermore, it is clear that the ALJ

considered Elliott's intellectual function by limiting her to unskilled work. "Unskilled work" is defined as "work which needs little or no judgment to do simple duties that can be learned on the job in a short period of time." 20 CFR §404.1568; §416.968. Additionally, there is nothing in the record to support Elliott's contention that she is limited to tasks that have only "one or two steps" as opposed to the "simple duties" described by the regulations. Indeed, Elliott worked for 29 years as a cashier, a waitress and in the housekeeping department of a hospital. There is no indication that these jobs involved only "one or two steps."

The Court also rejects Elliott's argument that the ALJ failed to properly develop the record with respect to her intellectual functioning. Pl. Mem., p. 15. "The ALJ bears a responsibility to develop the record fairly and fully, independent of the claimant's burden to press his case." Snead v. Barnhart, 360 F.3d 834, 838 (8th Cir. 2004) (citations omitted). This is because an administrative hearing is a non-adversarial proceeding; consequently, the ALJ must develop the record fully and fairly so that "'deserving claimants who apply for benefits receive justice.'" Wilcutts v. Apfel, 143 F.3d 1134, 1138 (8th Cir. 1998) (quoting Battles v. Shalala, 36 F.3d 43, 44 (8th Cir.1994). Moreover, because "[t]he ALJ possesses no interest in denying benefits and must act neutrally in developing the record," the ALJ's duty to develop the record exists even when the claimant is represented by counsel at the administrative hearing. Snead, 360 F.3d at 838.

"Where the ALJ fails to fully develop the record, this court may remand for the taking of further evidence." Hildebrand v. Barnhart, 302 F.3d 836, 838 (8th Cir. 2002), (citing Payton v. Shalala, 25 F.3d 684, 686 (8th Cir. 1994). But "reversal due to failure

to develop the record is only warranted where such failure is unfair or prejudicial." Shannon v. Chater, 54 F.3d 484, 488 (8th Cir. 1995) (citing Onstad v. Shalala, 999 F.2d 1232, 1234 (8th Cir.1993).

When a plaintiff has alleged that the ALJ failed to properly develop the record, the proper inquiry is whether the record contained sufficient evidence for fair determination. George v. Astrue, 301 Fed. Appx. 581, 582–83 (8th Cir. 2008). An ALJ's duty to develop the record is not unqualified, and does not relieve the claimant from identifying the issue or issues requiring further development. Wall v. Astrue, 561 F.3d 1048, 1062-1063 (10th Cir. 2009). Further, where a claimant is represented by counsel, as was the case here, the ALJ "should ordinarily be entitled to rely on the claimant's counsel to structure and present claimant's case in a way that the claimant's claims are adequately explored." Duncan v. Astrue, Civ. No. 08-2144, 2009 WL 1254737 at * 5 (D. Kan. May 5, 2009) (citing Hawkins v. Chater, 113 F.3d 1162, 1168 (10th Cir. 1997)). The ALJ has a duty to develop the record during a disability hearing consistent with the issues raised. Id. (citation omitted).

Here, apart from a one-line statement that the ALJ failed to properly develop the record with respect to her intellectual functioning, Elliott raised no specific concerns regarding her intellectual functioning at the hearing nor in her brief regarding this alleged error. Nevertheless, the ALJ clearly considered her intellectual capacities, (Tr. 24, 25), and the evidence regarding her mental ability. (Tr. 24, 25). As noted above, there was no evidence to suggest that Elliott's intellectual abilities prevented her from doing unskilled work with the restrictions imposed by the ALJ and there was no evidence that her job losses were the result of her inability to understand and follow

instructions.  In light of the evidence in the record and the ALJ's consideration of the evidence, this Court finds no error in either the ALJ's hypothetical questions or his development of the administrative record.

### C.    Weight Given to Dr. Topazian's Opinions

Elliott argued that the ALJ erred by failing to give appropriate weight to the opinions of Elliott's treating physician, Dr. Topazian.  Pl. Mem., pp. 16-17.  "A treating physician's opinion regarding an applicant's impairment will be granted controlling weight, provided the opinion is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record."  Hamilton v. Astrue, 518 F.3d 607, 610 (8th Cir. 2008) (quoting Singh v. Apfel, 222 F.3d 448, 452 (8th Cir. 2000) (citation omitted).  An opinion that a claimant is disabled or "unable to work," however, is not the type of opinion that the Commissioner gives controlling weight because that issue is reserved for the Commissioner.  Vossen v. Astrue, 612 F.3d 1011, 1015 (8th Cir. 2010).  The ALJ may give a treating physician's opinion less weight when the "the opinion conflicts with other substantial medical evidence contained within the record."  Wagner v. Astrue, 499 F.3d 842, 849 (8th Cir.2007) (quotation omitted).  "Moreover, an ALJ may credit other medical evaluations over that of the treating physician's when such other assessments are supported by better or more thorough medical evidence."  Id. (quotation omitted).

> Unless a treating source's opinion is given controlling weight, the administrative law judge must explain in the decision the weight given to the opinions of a State agency medical or psychological consultant or other program physician, psychologist or other medical specialist, as the administrative law judge must do for any opinions from treating sources, nontreating sources, and other nonexamining sources who do not work for us.

<u>20 C.F.R. § 404.1527(e)(2)(ii)</u>. The ALJ must consider the length, nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and specialization of the source when weighing opinions. <u>Id.</u> at § 404.1527(c)(2)(1–6).

The ALJ considered Dr. Topazian's opinion that Elliott's abdominal pain prevented her from working "several days a month." (Tr. 27, citing Tr. 450). However, the ALJ noted that Dr. Topazian also opined that Elliott would <u>occasionally</u> be unable to work as a result of her pain. (Tr. 28, citing Tr. 628). The ALJ found that these inconsistencies cut against giving greater weight to Dr. Topazian's opinions. (Tr. 28). Additionally, Dr. Topazian's opinion regarding Elliott's level of impairment was unsupported by the medical evidence as a whole and was contradicted by the ME's opinion. (Tr. 28-29). Further, the ALJ noted that Elliott had undergone many tests and procedures in an unsuccessful effort to identify the source of her pain. (Tr. 28). At the end of the day, the ALJ found that Dr. Topazian's opinions were based on Elliott's subjective reports and, as noted previously, the ALJ did not find Elliott to be wholly credible regarding the debilitating nature of her pain. (Tr. 28).

The ME acknowledged Elliott's pain symptoms, but emphasized that after all of the tests and procedures Elliott had undergone, her physician could find no organic basis for her pain. (Tr. 57). Therefore, the ALJ properly considered all of the other evidence in the record to conclude that the ME's opinion deserved greater weight than Dr. Topazian's opinion. This evidence included the episodic nature of Elliott's pain and the fact that her pain could be controlled with medication. (Tr. 28). Further, the record reflects that Dr. Topazian's opinion regarding Elliott's level of disability conflicted with

her full-time work history and her activities of daily living.  Moreover, Elliott's need to be absent from work occasionally as a result of her pain was included within the VE's opinion that a hypothetical individual with Elliott's limitations could be absent from work up to twice a month.

The ALJ weighed the opinion of Dr. Topazian, who treated Elliott but could not diagnose an organic basis for her subjective pain complaints, against the record as a whole, which included the ME's opinion that Elliott had the RFC to work within the limitations of a light RFC.  The Social Security regulations recognize State Agency consultants as "highly qualified" and "expert" in Social Security disability determinations. 20 C.F.R. §§ 404.1527(e)(2)(i), 416.927(e)(2)(i).  In light of the totality of the evidence, the Court finds no error in the way in which the ALJ considered and weighed the evidence and the opinions Dr. Topazian and the ME.  The ALJ's decision was reasonable and based on the substantial record as a whole and it should not be disturbed.

## IX.  CONCLUSION

This Court concludes that there was substantial evidence in the record to support the ALJ's determination that Elliott was not disabled and the ALJ committed no error in his evaluation of the medical evidence, including his consideration of the opinions of Elliott's treating physician, or in the hypothetical questions he posed to the VE.

## X.  RECOMMENDATION

For the reasons set forth above,

IT IS RECOMMENDED THAT:

1.  Plaintiff's Motion for Summary Judgment [Docket No. 11] be **DENIED**; and

2.      Defendant's Motion for Summary Judgment [Docket No. 14] be

**GRANTED**.

Dated: July 23, 2013

> *Janie S. Mayeron*
> JANIE S. MAYERON
> United State Magistrate Judge

## **NOTICE**

Under D. Minn. LR 72.2(b), any party may object to this Report and Recommendation by filing with the Clerk of Court, and serving all parties by **August 6, 2013**, a writing which specifically identifies those portions of this Report to which objections are made and the basis of those objections.  Failure to comply with this procedure may operate as a forfeiture of the objecting party's right to seek review in the Court of Appeals.  A party may respond to the objecting party's brief within fourteen days after service thereof.  A judge shall make a de novo determination of those portions to which objection is made.